**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Case No. 25-90818 |
| 57 Concrete LLC,[1] | Chapter 11 |
| Debtor. | |

---

**DECLARATION OF ELIUD R. CAVAZOS IN SUPPORT OF**
**VOLUNTARY PETITION AND FIRST DAY MOTIONS**

---

I, Eliud R. Cavazos, hereby declare, pursuant to 28 U. S. C. §1746, under penalty of perjury as follows:

1.     I am the Chief Executive Officer and a managing member of 57 Concrete LLC (the "Debtor" or the "Company"). I have held a senior leadership and ownership role with the Debtor since its formation in July 2019, and I have been continuously responsible for the Debtor's day-to-day operations, strategic decision-making, and financial affairs.

2.     I submit this Declaration based on personal knowledge in support of the Chapter 11 petition of the Debtor that filed a voluntary petition under chapter 11 of the Bankruptcy Code on December 19, 2025 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").  I submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case") and to provide evidentiary support for the First Day Motions (defined in paragraph 8 below), below, filed by the Debtor. Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal

---

[1]     The last four digits of its Employer Identification Numbers is 0886.  The Debtor's mailing address is: 4877 Western Rd., Mission, TX 78574.

knowledge, my review of relevant documents, discussions with employees of the Debtor, or my opinions based upon experience, knowledge and information concerning the Debtor.  If called upon to testify, I would testify as set forth in this Declaration.

3. The Debtor is a Texas limited liability company with its principal place of business located in Mission, Texas, in the Rio Grande Valley. Since commencing operations in or around October 2019, the Debtor has grown into a substantial concrete and construction services business operating a large fleet of trucks, mixers, trailers, and related heavy equipment. The Company is the largest concrete supplier in the Rio Grande Valley.  The Debtor currently employs approximately 97 employees, whose livelihoods depend on the continued operation of the business.

4. Together with Jesus Cepeda, who is also a principal owner and manager of the Debtor, we are directly involved in virtually every critical aspect of the Debtor's business. We oversee daily operations, customer relationships, equipment utilization, payroll, safety compliance, insurance, financing, and vendor relationships. In practical terms, we are the business, and the Debtor's ability to operate as a going concern depends on our continued work and involvement.

5. In my professional capacity, I regularly execute and authorize major financial and operational documents on behalf of the Debtor and its affiliated entities, including equipment financing agreements, security agreements, merchant cash advance agreements, ACH and payment authorizations, insurance certificates, compliance documents, and delivery and acceptance certificates. I have personally guaranteed, or authorized the Debtor to incur, obligations with numerous commercial lenders and counterparties, including equipment finance companies and banks serving the construction industry in the Rio Grande valley.

2

6.     The Debtor's customers, lenders, insurers, and vendors routinely deal directly with me and with Mr. Cepeda. We are the primary points of contact for equipment financing, credit approvals, insurance matters, and operational decision-making. The sudden loss of our ability to manage, supervise, and act on behalf of the Debtor would materially impair the Debtor's operations, disrupt relationships with counterparties, and jeopardize the Debtor's workforce.

7.     For these reasons, my continued service, together with that of Mr. Cepeda, is essential to preserving the value of the Debtor's business, maintaining employment for its workforce, and effectuating a successful restructuring through this chapter 11 case.

8.     To facilitate a smooth entrance into Chapter 11, to minimize any adverse effects and disruption of business from filing the petition (the "Petition"), and to preserve value for the benefit of all stakeholders, the Debtor has filed a number of motions requesting various forms of "first day" relief (collectively, the "First Day Motions").  The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  The relief requested in the First Day Motions is necessary to preserve and maximize the value of the Debtor's estate and to allow it to sustain its current operations in chapter 11 through confirmation of a plan of reorganization. I have reviewed the First Day Motions and I believe that the relief requested is necessary to ensure the success of the Chapter 11 Case.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.  Company Background

9.     The Debtor is a Texas limited liability company formed in July 2019, with its principal place of business located at 4877 Western Road, Mission, Texas, in Hidalgo County. The Company was founded to address a longstanding need in the Rio Grande Valley for improved reliability, service quality, and consistency in the ready-mix concrete market.

10.     Prior to forming the Company, we observed persistent service disruptions, delivery delays, and quality issues affecting residential builders, small businesses, and public works projects throughout the region. Following a period of analysis, market study, and business planning, the Company commenced operations in or around August 2020.

11.     At inception, the Company was unable to obtain traditional bank financing and therefore acquired its initial fleet of four concrete mixer trucks through non-traditional, higher-cost financing arrangements. This initial capital investment reflected management's confidence in the Company's service-oriented business model and anticipated customer demand.

12.     The Company began operations with approximately seven employees and adopted an operating model focused on responsiveness and customer service, including offering extended and, in some cases, 24-hour delivery capabilities. This approach contributed to early customer supported sustained  profitable growth.

13.     During its first year of operations, the Company expanded its fleet to approximately twelve mixer trucks and achieved production levels comparable to competitors operating significantly larger fleets. The Company invested heavily in workforce development, including promoting drivers into sales roles and providing training to support internal advancement. The Company also established an in-house quality control laboratory and a dedicated quality control team to oversee aggregate inspection, mix design verification, field testing, and compliance documentation.

14.     Since its formation, the Company has continued to be profitable and grow and currently operates a fleet of approximately 224 vehicles, including trucks, mixers, trailers, and related construction equipment. The Company today employs approximately 97 employees, making it a significant employer in the Rio Grande Valley.

15.     Since inception, the Company has operated with the objective of providing reliable, high-quality concrete services to customers throughout the Rio Grande Valley. Since the inception of the Company, the Company generated annual gross revenue and annual EBITDA in the approximate amounts as set forth in the following chart:

| Year | Revenue | EBITDA |
|---|---|---|
| 2020 (partial year) | $1,526,537 | $131,551 |
| 2021 | $10,846,289 | $1,051,182 |
| 2022 | $18,697,148 | $2,332,683 |
| 2023 | $30,303,187 | $2,594,525 |
| 2024 | $45,254,743 | $3,888,623 |
| 2025 (partial year, interim) | $65,900,687 | $8,146,191 |

**B.  Prepetition Debt**

16.     As of the Petition Date, the Company's liabilities consist primarily of debt incurred in connection with equipment financing and leasing arrangements necessary to support its fleet-based operations.

17.     Prior to the Petition Date, the Company entered into various credit agreements, loan agreements and other similar documents (collectively, the "Prepetition Loan Agreements") with multiple equipment lenders and financing counterparties (collectively, the "Prepetition Lenders"). Pursuant to these agreements, the Company incurred obligations (the "Equipment Related Debt") that are secured by liens on such vehicles, equipment and related collateral.  As of the Petition Date, the Equipment Related Debt is approximately $26.7 Million.

18.     In addition to the Equipment Related Debt, the Company incurred unsecured obligations in the ordinary course of business, including obligations to landlords, trade vendors, service providers, and other counterparties.   Due to the liquidity constraints described below, the Company has been unable to satisfy all such obligations as they became due. As of the Petition Date, the Company estimates that it owed approximately $6.5 million in unsecured trade and operational debt.

19.     In addition to the foregoing debt, the Company has also entered into merchant cash advance arrangements.   As of the Petition Date, the merchant cash advance providers will likely allege that the remaining outstanding balance under these arrangements is approximately $1.8 million, which the Company disputes.

C.  **Events Leading to Chapter 11 Cases**

20.     The Company supplies ready-mix concrete to both residential and commercial construction projects throughout the Rio Grande Valley. Historically, residential construction accounted for approximately seventy percent (70%) of the Company's overall business. This segment of the construction industry is labor-intensive and highly dependent on the availability of skilled construction workers from Mexico.

21.     Beginning in or around May 2025, the Company experienced a sudden and sustained decline in demand from residential builder customers. This decline coincided with heightened immigration enforcement activity conducted by U.S. Immigration and Customs Enforcement ("ICE") in the Rio Grande Valley, including worksite enforcement actions reported by affected builders. As a direct result of these enforcement actions, many residential builders experienced acute labor shortages, work stoppages, and project suspensions. In numerous instances, projects were delayed or abandoned entirely due to the inability to staff job sites. The

Company observed these impacts firsthand through direct communications with its customers and the abrupt cancellation or suspension of scheduled concrete deliveries.

22. Based on internal utilization, dispatch, and production records, the Company estimates that residential concrete utilization declined by approximately sixty percent (60%) beginning in May 2025 as a direct consequence of these labor-related disruptions. This decline was abrupt, sustained, and external to the Company's operations, and it materially impaired revenues, cash flow, and the Company's ability to absorb fixed operating costs.

23. Despite proactive efforts by management to manage expenses, shift focus toward commercial customers, and maintain operational efficiency, the Company was unable to fully offset the loss of residential volume caused by these enforcement-driven market disruptions.

24. The resulting liquidity constraints were not caused by mismanagement or operational inefficiencies. Rather, they stemmed from external governmental enforcement activity that materially altered the regional construction labor market in a manner that could not reasonably have been anticipated or mitigated.

25. After evaluating available alternatives, including cost reductions, negotiations with lenders and vendors, and other restructuring options, the Company determined that filing this Chapter 11 case in good faith was necessary to stabilize operations, preserve going-concern value, protect approximately 97 direct jobs in the Rio Grande Valley, numerous indirect jobs, and maximize recoveries for creditors.

## **FIRST DAY PLEADINGS**

26. I have read and am familiar with the contents of each First Day Motion filed by the Debtor (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each First Day Motion is necessary and (a) will enable Debtor to avoid suffering immediate and irreparable harm to its business, but, rather

will  sustain operations with minimal disruption while in the Chapter 11 Case; (b) is critical to the Debtor's ability to maximize the value of its estate; and (c) is in the best interest of the Debtor's, its creditors and other stakeholders.

**A. Debtor's Emergency Motion For Entry of An Order Authorizing the Debtor To Pay Prepetition Wages, Salaries, Other Compensation, and Granting Related Relief (the "Wages Motion")**

27.     The Debtor's operations are highly labor-intensive and depend on a stable, skilled, and experienced workforce to function on a daily basis. The Debtor's employees perform mission-critical roles, including concrete mixer truck driving, equipment operation, dispatch, maintenance, logistics, quality control, and administrative support. Without these employees, the Debtor cannot operate its business, service customers, or generate revenue.

28.     As of the Petition Date, the Debtor employs approximately 97 individuals, consisting of hourly employees and salaried employees, based on the nature of their services. These individuals collectively support the Debtor's fleet operations, production scheduling, customer fulfillment, and compliance obligations. The Debtor's employees are compensated on a weekly basis, typically one week in arrears, consistent with long-standing prepetition payroll practices.

29.     Payroll for the Debtor is processed through QuickBooks, and employees are paid by check in the ordinary course of business. As of the Petition Date, approximately one full payroll period of wages, salaries, and other compensation had accrued but remained unpaid. Based on the Debtor's books and records, I estimate that the aggregate amount of unpaid prepetition wages and compensation is approximately $113,000. In addition, certain payroll checks issued immediately prior to the Petition Date may not have cleared before the commencement of this Chapter 11 Case.

30.     The Debtor's employees rely on their wages and other compensation to meet daily living expenses and support their families. Many of the Debtor's employees reside in the Rio

8

Grande Valley and depend on consistent weekly paychecks to cover necessities such as housing, food, transportation, and healthcare. Any interruption or delay in payment would impose immediate hardship on these individuals and their families.

31.     Continuity of the Debtor's workforce is essential to preserving the Debtor's business as a going concern. If the Debtor is unable to promptly pay accrued prepetition wages and honor outstanding payroll checks, employees may seek alternative employment. Given the specialized nature of the Debtor's operations and the tight labor market for qualified drivers and equipment operators, the loss of employees would materially impair the Debtor's ability to operate and would cause immediate and irreparable harm to the business.

32.     In addition to wages and salaries, the Debtor is required by federal and applicable state law to withhold amounts from employee wages for income taxes, Social Security, and Medicare. These withheld amounts are trust fund obligations and do not constitute property of the Debtor's bankruptcy estate. As of the Petition Date, certain payroll tax withholdings and related obligations remain outstanding and must be brought current in order to comply with applicable law and avoid penalties and personal liability.

33.     The Debtor is also obligated to remit employer-paid payroll taxes, including the employer portion of Social Security and Medicare taxes and federal and state unemployment taxes. These obligations are calculated as a percentage of gross payroll and are customarily processed and remitted contemporaneously with the issuance of employee payroll. Failure to timely remit these amounts would expose the Debtor and its principals to regulatory enforcement and could disrupt payroll processing.

34.     None of the payments requested in the Wages Motion exceed the statutory priority cap applicable to employee wage claims under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, which is currently $17,150 per employee. Accordingly, the relief sought affects only the

9

timing of payment of priority claims that must be paid in full in order to confirm a chapter 11 plan and does not prejudice general unsecured creditors.

35.     Authorizing the Debtor to pay prepetition wages, salaries, and related compensation, to honor outstanding payroll checks, and to remit required withholding obligations is critical to the Debtors business and maintaining employee morale, preserving operational continuity, and stabilizing the Debtor's business during the initial days of this Chapter 11 Case. Without this relief, the Debtor's ability to reorganize would be severely compromised.

36.     For these reasons, immediate authorization to pay prepetition wages and related obligations is necessary to avoid immediate and irreparable harm to the Debtor, its workforce, and its restructuring efforts.

**B. Debtor's Emergency Motion For Entry of An Order Authorizing the Debtor To Sell and Factor Post-Petition Accounts Receivable To Charter Capital Holdings LP Pursuant To Factoring Agreement (the "<u>Factoring Motion</u>")**

37.     The Debtor's business generates accounts receivable in the ordinary course of its concrete and construction operations. Customers are typically invoiced after delivery, and payment is received on a delayed basis. As a result, there is an inherent timing gap between the Debtor's incurrence of operating expenses, including payroll, fuel, insurance, and equipment maintenance, and the receipt of customer payments.

38.     The Debtor's operations are capital intensive and require steady and predictable access to working capital to function on a daily basis. Payroll, fuel, insurance premiums, equipment repairs, parts, tires, and dispatch-related expenses must be paid on a current basis in order for the Debtor to continue operating its fleet and servicing customers.

39.     Prior to the Petition Date, the Debtor entered into a receivables factoring arrangement with Charter Capital Holdings LP (the "<u>Purchaser</u>") pursuant to a purchase and sale agreement (the "<u>Factoring Agreement</u>"). Under the Factoring Agreement, the Debtor sells eligible

accounts receivable to the Purchaser at a discount, and the Purchaser assumes responsibility for collection. This arrangement is structured as a sale of receivables rather than a loan, and the Purchaser has sole discretion to approve or reject receivables submitted for purchase.

40.     The factoring arrangement has historically provided the Debtor with immediate liquidity tied directly to its revenue-generating activities and has allowed the Debtor to fund ongoing operations without incurring additional debt. The Debtor has relied on this arrangement as a critical component of its working capital management and cash flow stabilization.

41.     Following the Petition Date, the Debtor requires uninterrupted access to working capital in order to continue operations as a going concern. The Debtor does not have sufficient unrestricted cash on hand to fund payroll and other essential operating expenses solely from existing cash balances, nor does it have access to traditional post-petition financing on an expedited basis.

42.     The ability to sell post-petition accounts receivable to the Purchaser under the existing factoring framework provides the Debtor with an immediate and reliable source of liquidity that is directly linked to ongoing operations. Without this relief, the Debtor would face a significant cash shortfall that would impair its ability to pay employees, purchase fuel, maintain equipment, and meet other mission-critical obligations.

43.     Any interruption in the Debtor's access to working capital would cause immediate and irreparable harm to the business. The Debtor's fleet operations depend on continuous deployment of equipment and personnel, and even a short disruption in funding would lead to missed deliveries, loss of customer confidence, and cascading operational failures.

44.     The accounts receivable that the Debtor seeks to sell pursuant to the Factoring Motion will be created post-petition, in the ordinary course of the Debtor's ongoing business. These receivables are not proceeds of prepetition collateral and are essential to funding post-

petition operations through factoring. Authorizing the factoring and sale of such receivables will allow the Debtor to access immediate operating cash without increasing leverage or burdening the estate with new debt.

45.     The proposed factoring arrangement does not prejudice creditors. To the contrary, it preserves the Debtor's ability to continue operating, generating revenue, and maintaining the going-concern value of the business for the benefit of all stakeholders. Absent the requested relief, the Debtor's restructuring efforts would be jeopardized at the outset of this Chapter 11 Case.

46.     For these reasons, immediate authorization to sell and factor post-petition accounts receivable pursuant to the Factoring Agreement is necessary to avoid immediate and irreparable harm to the Debtor's operations and to preserve the value of the Debtor's estate.

**C. Emergency Motion For (I) Approval of the Proposed Adequate Assurance of Payment For Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving Procedures For Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion")**

47.     The Debtor's operations depend on the continuous and uninterrupted provision of essential utility services, including electricity, natural gas, water, sewer, waste disposal, and related services (collectively, the "Utility Services"). These Utility Services are required to operate the Debtor's concrete production facilities, dispatch and logistics functions, maintenance operations, quality control activities, and corporate offices.

48.     The Debtor operates a fleet-based concrete business that requires the ability to power batch plants, maintain equipment, operate lighting and safety systems, supply water for concrete production and testing, and ensure sanitary and regulatory-compliant working conditions for employees. Any interruption in Utility Services, even for a short period, would immediately disrupt production, halt deliveries, idle equipment, and prevent the Debtor from servicing customers.

49.     In addition to production facilities, the Debtor maintains office and administrative functions that are critical to daily operations, including dispatch, billing, payroll processing, compliance, and safety oversight. These functions cannot operate without reliable Utility Services. A disruption would impair communications, delay invoicing and collections, and interfere with the Debtor's ability to manage its workforce and fleet.

50.     As of the Petition Date, the Debtor receives Utility Services from multiple utility providers servicing its facilities and operations in the Rio Grande Valley. The Debtor has made a good-faith effort to identify all such providers and has compiled a Utility Providers List attached to the proposed order. The Debtor's average monthly utility expense, calculated over the twelve-month period ending November 2025, is approximately $40,000, reflecting the scale and energy-intensive nature of its operations.

51.     In addition to continuing to pay post-petition utility charges in the ordinary course, the Debtor proposes to provide an additional cash deposit (the "Adequate Assurance Deposit") to be held in a segregated account for the benefit of Utility Providers. The Debtor's ongoing cash flow from operations and the Adequate Assurance Deposit provides meaningful protection against any risk of nonpayment.

52.     The Debtor expects to have sufficient liquidity, to fund ongoing Utility Services while continuing operations during this Chapter 11 Case. The Proposed Adequate Assurance is consistent with the Debtor's historical payment practices and is sufficient to ensure that Utility Providers are not exposed to unreasonable risk.

53.     If any Utility Provider were to alter, refuse, or discontinue Utility Services, even temporarily, the consequences to the Debtor would be immediate and severe. Concrete production would stop, deliveries would be missed, customer relationships would be damaged, and the Debtor

13

would incur substantial costs and delays to restart operations. Such disruptions would materially impair the Debtor's revenue-generating capacity and threaten the viability of the restructuring.

54. The Debtor cannot feasibly replace Utility Services on short notice, and alternative providers are not readily available for many of the locations and services involved. As a result, uninterrupted Utility Services are essential to preserving the Debtor's going-concern value and protecting the interests of employees, customers, and creditors.

55. For these reasons, approval of the Proposed Adequate Assurance, implementation of the Adequate Assurance Procedures, and entry of an order prohibiting Utility Providers from altering, refusing, or discontinuing services are necessary to avoid immediate and irreparable harm to the Debtor and to support a successful restructuring.

**D. Debtor's Emergency Motion For Entry of Interim and Final Orders Authorizing the Debtor To Continue To Operate Its Cash Management System and Maintain Existing Bank Accounts, And Granting Related Relief (the "<u>Cash Management Motion</u>")**

56. In the ordinary course of its business, the Debtor utilizes certain bank accounts that constitute its cash management system to collect, transfer, and disburse funds (the "<u>Cash Management System</u>"). This system has been developed and refined over time and is essential to the Debtor's day-to-day operations, including payroll processing, payment of vendors, receipt of customer payments, and compliance with tax and regulatory obligations.

57. The Debtor currently maintains multiple bank accounts. These accounts are used to receive customer payments, process payroll, pay fuel and maintenance vendors, remit taxes, and fund other critical operating expenses. The Cash Management System is integrated with the Debtor's accounting software and payroll processes, and employees and management rely on its continued functionality to perform their daily responsibilities.

58.     An abrupt closure of existing bank accounts or a forced transition to an entirely new cash management structure would cause immediate disruption to the Debtor's operations. Such disruption would interfere with payroll processing, delay vendor payments, impede collections, and create confusion among employees, customers, and counterparties. In my experience, even short interruptions in access to bank accounts can have cascading operational effects that are difficult and costly to remediate.

59.     The Debtor's primary operating accounts are maintained at Bank of America, which is an authorized depository approved by the United States Trustee. The Debtor also maintains certain legacy accounts at other financial institutions, which it intends to close in an orderly manner and consolidate into its Bank of America accounts to streamline operations and ensure compliance with applicable bankruptcy requirements.

60.     The Debtor uses QuickBooks and related electronic payment systems to manage its cash flow, track receivables and disbursements, and generate financial reporting. This system is fully integrated with the Debtor's existing bank accounts. Requiring the Debtor to immediately abandon this system or reconfigure its banking relationships would impose unnecessary administrative burdens, increase costs, and divert management attention at a critical juncture in this Chapter 11 Case.

61.     The Debtor has longstanding deposit agreements and banking relationships with its Cash Management Banks, which govern account maintenance, fees, chargebacks, ACH transactions, and other routine banking functions. Continuing these relationships on an uninterrupted basis allows the Debtor to maintain operational stability while transitioning into Chapter 11.

62.     Certain checks, ACH transactions, wire transfers, and other payment instructions were issued or initiated prior to the Petition Date in the ordinary course of business. If these

transactions are dishonored or rejected solely due to the bankruptcy filing, the Debtor could face payroll disruptions, vendor disputes, returned payments, and additional fees, all of which would harm the Debtor's operations and stakeholder relationships.

63.     The Debtor also incurs ordinary course bank fees and charges associated with maintaining its Cash Management System, including account maintenance fees, transaction fees, and merchant processing fees. These fees are routine, commercially reasonable, and necessary to ensure uninterrupted access to banking services.

64.     Authorizing the Debtor to continue operating its Cash Management System, maintain its existing bank accounts, honor certain prepetition obligations related thereto, and continue using existing business forms is essential to ensuring a smooth and orderly transition into Chapter 11. This relief minimizes disruption, preserves operational continuity, and allows employees and management to remain focused on serving customers and stabilizing the business.

65.     The Debtor has adequate internal controls and accounting procedures in place to distinguish between prepetition and post-petition transactions and to prevent the unauthorized payment of prepetition claims. The requested relief will not prejudice creditors and is in the best interests of the Debtor's estate.

66.     Without the relief requested in the Cash Management Motion, the Debtor would face immediate and irreparable harm, including the inability to process payroll, pay vendors, collect receivables, and comply with regulatory and tax obligations. Such harm would threaten the Debtor's operations at the outset of this Chapter 11 Case and undermine its ability to reorganize successfully.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 19, 2025

_____
Eliud R. Cavazos

17